IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

DONALD GREGORY GRIFFITH,

     Plaintiff,

v.                                     Case No.: 3:16-cv-07183

NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,

     Defendant.

## MEMORANDUM OPINION

     This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 5). The court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and is therefore **AFFIRMED**.

## I.   Procedural History

     On January 22, 2013, Plaintiff Donald Gregory Griffith ("Claimant") completed applications for DIB and SSI alleging a disability onset date of January 1, 2012 due to

uncontrollable high blood pressure; "hepatitis C; "eye stroke double vision, vision blockage; prediabetes, [and] pre-glaucoma." (Tr. at 226, 233, 259). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 99-112, 202-211). Claimant filed a request for a hearing, which was held on December 3, 2014 before the Honorable Jane A. Crawford, Administrative Law Judge ("ALJ"). (Tr. at 26-53). By written decision dated December 31, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 7-25). The ALJ's decision became the final decision of the Commissioner on June 2, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5).

On August 3, 2016, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on October 7, 2016. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). The time period for the filing of a reply has expired. Accordingly, this matter is fully briefed and ready for disposition.

## II.  Claimant's Background

Claimant was 52 years old at the time of his alleged onset of disability and 55 years old at the time of the ALJ's decision. (Tr. at 18, 166). He has a tenth grade education and communicates in English. (Tr. at 258, 260). Claimant previously worked as an Ironworker. (Tr. at 260).

## III.  Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental

capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 1, 2012, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "hypertension, obesity, deficit in visual acuity, and mild loss of field of vision." (*Id.*, Finding No. 3). The ALJ also considered Claimant's Hepatitis C, but concluded that such impairment was nonsevere. (Tr. at 12-13). As for the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 13-14, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with the following additional limitations: The claimant cannot work with vibrating equipment; cannot climb ladders, ropes, or scaffolds; and cannot work at unprotected heights or around dangerous machinery. The claimant has some difficulty with his vision but can avoid hazards in the workplace.

(Tr. at 14-18, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform his past relevant work. (Tr. at 18, Finding No. 6). Under the fifth and

4

final inquiry, the ALJ reviewed Claimant's prior work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 18-19, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1959, and was defined as an individual closely approaching advanced age on the alleged disability onset date, but subsequently changed age category to advanced age; (2) he had limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules (the "Grids") supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 18, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled work as a janitor cleaner, warehouse worker, or bottling line attendant at the medium exertional level. (Tr. at 18-19, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 19-20, Finding No. 11).

## IV.    Claimant's Challenge to the Commissioner's Decision

Claimant raises one challenge to the Commissioner's decision; that being, the ALJ erred by finding Claimant capable of medium exertional level work. According to Claimant, the evidence unequivocally demonstrates that he is limited to sedentary work. Thus, Grid Rule 201.10 directs a finding that he was disabled as of the date of his alleged onset of disability.[1] (ECF No. 11 at 4-6). In the alternative, Claimant contends that even if he were restricted to light exertional level work, the ALJ should have deemed him disabled as of his fifty-fifth birthday under Grid Rule 202.02. (*Id.* at 6). In support of his

---

[1] As more fully explained below, the Grids "contain numbered table rules which direct conclusions of 'disabled' or 'not disabled' where all of the individual findings coincide with those of a numbered rule." SSR 83–12, 1983 WL 31253, at *1 (S.S.A.1983); *see* 20 C.F.R. Pt. 404, Subpart P, Appendix 2.

argument, Claimant cites his age, education, previous work experience, testimony, and the findings of consultative examining physicians, Eugene Lin, M.D., and Paul W. Craig, M.D., as well as those of treating physician, Zachary Hansen, M.D. (*Id.* at 5-6). In response to Claimant's arguments, the Commissioner contends that substantial evidence supports the ALJ's finding that Claimant was capable of medium level work. (ECF No. 12 at 8-12).

## V.    <u>Relevant Evidence</u>

The court has reviewed the transcript of proceedings in its entirety, including the treatment records, medical source opinions, and Claimant's statements. The following summary is confined to those entries most relevant to the issue in dispute.

### A. *Treatment Records*

On February 11, 2011, Claimant presented to Damia Hayman, Certified Family Nurse Practitioner ("CFNP"), at Valley Health Systems ("Valley Health") for follow-up of hypertension, insomnia, and generalized anxiety. (Tr. at 356-57). Claimant's physical examination was normal and his chronic medical conditions were stable. Nurse Hayman observed that Claimant's blood pressure was elevated at 188/104 in the left arm and 156/86 in the right arm, but also noted that he had not taken his anti-hypertensive medications for three weeks. Nurse Hayman explained to Claimant the importance of never being without his medications and instructed him to continue with his current treatment regimen. Claimant verbalized his understanding.

Later that year, on October 20, 2011, Claimant returned to Valley Health for a blood pressure check. (Tr. at 354-55). Claimant stated that he felt "good," although his blood pressure was measured at 190/124. Claimant admitted that he had run out of his blood pressure medications and had not taken any for two days. His blood pressure was

rechecked, and this time measured 168/90. Nurse Hayman emphasized the need for Claimant taking all of his medications as prescribed. Upon learning that Claimant was uninsured, Nurse Hayman educated Claimant on available assistance programs and sliding scales to help him pay for his prescriptions. She also provided him with medication samples.

Claimant returned ten days later, on October 30, 2011, for follow-up. (Tr. at 352-53). He reported feeling good, but his blood pressure was measured at 188/102. Claimant was given Clonidine, and his pressure dropped to 158/96, with a reading of 138/90 in the left arm. Claimant also reported a history of Hepatitis C; although, he indicated that he had never gotten any treatment for the illness. Nurse Hayman documented that Claimant needed to stop smoking and drinking and needed to get medical care for Hepatitis C. She also instructed Claimant not to use salt in his diet and to return in one week. Claimant returned on November 15, and his blood pressure was 159/96 when taken automatically and 148/92 when checked manually. (Tr. at 351).

Over one year later, on November 7, 2012, Claimant had a follow-up visit at Valley Health with Julie Vannoy, Certified Nurse Practitioner ("CNP-BC"). (Tr. at 350). Claimant reported that his blood pressure had been "off" since July 2012; he had a history of Hepatitis C; and he was experiencing double vision, headache, and dizziness. Claimant's blood pressure was taken, and it measured 200/118. However, he denied chest pain, palpitations, and shortness of breath. His physical examination was normal, and he was neurologically intact. Nurse Vannoy assessed Claimant to be in hypertensive crisis. He was administered Clonidine, and when his blood pressure was rechecked 15 minutes later, it had decreased to 190/110. Claimant was prescribed Clonidine for hypertension, Exforge for blurred vision, and Celexa for generalized anxiety disorder.

The following month, on December 12, 2012, Claimant returned to Valley Health and saw Nurse Vannoy. (Tr. at 345). Claimant reported that Exforge was helping to reduce his blood pressure, but admitted that he had run out of the medication several days earlier. Claimant's blood pressure was taken, and it measured 202/133. His blood pressure was re-checked twice during the visit and decreased to 196/124 and then to 187/122. With respect to his Hepatitis C, Claimant still had not received treatment. He explained that at the time of his diagnosis, he was told by a gastroenterologist that treatment could not be initiated until Claimant was alcohol-free for six months. However, Claimant had continued to drink. Nurse Vannoy encouraged Claimant to stop using alcohol, to follow-up with a gastroenterologist, and to continue taking his medications. She told him to return for a blood pressure check in one week.

One week later, Claimant returned as instructed. (Tr. at 344). He denied chest pain, palpitations, or shortness of breath, and his blood pressure was 174/105. A review of systems revealed no new complaints. Claimant's physical examination was normal, except for his blood pressure and weight. He was prescribed Metformin to treat diabetes, Metoprolol for high blood pressure, and Ambien for insomnia. Nurse Vannoy counseled Claimant regarding the need to watch his diet and to exercise.

On January 2, 2013,[2] Claimant presented to Valley Health for regular follow-up. (Tr. at 379). His blood pressure was 187/115, but he had not taken his medication that morning. Claimant reported that his blood pressure was generally measuring 155/90 at home. He denied chest pain, palpitations, and shortness of breath. Claimant had no particular complaints on a review of systems and his physical examination was normal,

---

[2] The clinic visit is incorrectly hand-stamped January 2, 2012, but the computer-generated stamp and other records confirm the visit occurred on January 2, 2013.

except for his blood pressure and weight, which was 266 pounds. Claimant continued to smoke and was encouraged to quit. He was scheduled for an ultrasound of his kidneys and prescribed Exforge for his hypertension.

Two days later, on January 4, 2013, Claimant had an eye examination at University Eye Surgeons. (Tr. at 333). His vision was 20/40 in the right eye and 20/80 in the left eye, although, Claimant stated that his visual acuity fluctuated and his eyes burned and felt "gravely." He was not taking any medications for his eyes. Claimant's chief medical complaints were uncontrolled hypertension and diabetes. Claimant explained that he had received a diagnosis of high blood pressure ten years earlier and took blood pressure medications; however, his blood pressure was not controlled. Claimant's blood pressure was taken, and it measured 170/104. He also complained of a history of blurred vision and horizontal diplopia (double vision), which had lasted two weeks, but was now resolved.

On January 16, 2013, Claimant returned to Nurse Vannoy to follow up on the results of the renal ultrasound and to obtain documentation for a disability claim. (Tr. at 342). Nurse Vannoy advised Claimant that his ultrasound showed no evidence of renal artery stenosis. Claimant reported doing well on his medications, and a review of systems was unremarkable. Claimant's physical examination revealed no abnormalities, except for his blood pressure, which was elevated at 171/90, and his weight, which was 246 pounds. Claimant was prescribed additional medication to treat his hypertension, was encouraged to quit smoking, and was referred to a cardiologist for work-up. Nurse Vannoy also recommended that Claimant undergo a sleep study, but he refused.

On February 26, 2013, Claimant saw cardiologist, Choudhary Rayani, M.D., at the Holzer Clinic. (Tr. at 412-15). Claimant was referred for uncontrolled hypertension, with

recurrent transient ischemic attacks involving his vision. He reported a long history of hypertension, indicating that he was currently taking five different medications for hypertension; however, his systolic blood pressure remained in the "180s to 200s." Claimant also admitted to a history of heavy drinking, but stated he was now only a "social" drinker. Claimant smoked 5-6 cigarettes each day. He denied exertional chest pain, syncope, orthopnea, pparoxysmal nocturnal dyspnea, and edema, but had mild shortness of breath and dizziness. With respect to his cardiac history, Claimant advised that he was negative for coronary artery disease. He reported having congestive heart failure in March 2009, which resulted in a diagnostic cardiac catheterization that was normal.

On physical examination, Claimant was observed to be obese, with a blood pressure of 178/106 and a heart rate of 90. His physical findings were otherwise normal. Dr. Rayani counseled Claimant on the negative effect of tobacco on his health and the availability of cessation options. He also discussed the management of Claimant's uncontrolled hypertension with Claimant and his wife. Dr. Rayani did not feel a cardiac workup was necessary, but scheduled a nephrology evaluation and suggested a referral to the Ohio State University Hypertension Clinic. Claimant requested that Dr. Rayani complete disability paperwork; however, Dr. Rayani declined on the basis that he had only seen Claimant on the one occasion and did not feel he knew Claimant well enough to provide disability opinions.

On March 13, 2013, Claimant saw Zachary Hansen, M.D., at Valley Health "for assistance in his blood pressure control as well as for paperwork applying for disability through local and workers' union." (Tr. at 452-54). Claimant reported a history of uncontrolled hypertension, congestive heart failure, strokes in the eye secondary to

hypertension, and prediabetes. He denied cardiac symptoms and indicated that he had a heart catheterization in 2010 that was normal. Claimant provided his medication and health history, as well as his family and social history. He admitted to smoking four to five cigarettes and drinking two cans of beer per day. Claimant stated that he had worked as an Ironworker until he was laid off in 2011. Based on the history provided, Dr. Hansen expressed concern that Claimant's vision might prevent him from performing his prior work, and his dizziness and poor balance would place him at high risk for work place injury. On examination, Claimant's blood pressure was 195/106, but he appeared alert and oriented with essentially normal physical findings. Dr. Hansen diagnosed Claimant with hypertension, prediabetes, Hepatitis C, and anxiety/depression. Dr. Hansen agreed to complete Claimant's disability paperwork and to provide an opinion that Claimant was likely not able to work due to visual limitations. Claimant was instructed to follow up with the nurse practitioner.

On March 18, 2013, Claimant followed up with Nurse Vannoy. (Tr. at 378). He advised that he had seen a cardiologist, who did not change any of his medications, but referred him to a nephrologist. Claimant denied chest pain, palpitations, and shortness of breath. His review of systems and physical examination were normal, except for his blood pressure, which was 160/112, and his weight. Nurse Vannoy instructed Claimant to keep his appointment with the nephrologist, to follow up with his cardiologist, and to return in one month.

Claimant saw Nurse Vannoy again on May 13, 2013. (Tr. at 377). His prescriptions for Clonidine, Exforge, Metoprolol, and Hydrochlorothiazide were refilled. Claimant denied chest pain, palpitations, and shortness of breath, and he had no new or specific complaints. His physical examination was normal, except for his blood pressure, which

was 187/113, and his weight. To further evaluate Claimant's resistant hypertension, Nurse Vannoy planned to check Claimant's aldosterone-to-renin ratio.[3] She also increased Claimant's dosage of Clonidine and encouraged him to quit smoking. Nurse Vannoy again suggested that Claimant participate in a sleep study to evaluate his complaint of insomnia, but he refused.

On May 28, 2013, Claimant advised Nurse Vannoy that he had canceled his appointment with the nephrologist. (Tr. at 376). Nurse Vannoy noted that Claimant had no new or specific complaints and his physical examination was normal, except for his weight, which was 250 pounds. Claimant's blood pressure was measured and was only slightly abnormal at 147/91. Nurse Vannoy renewed Claimant's referral to a nephrologist and encouraged him to quit smoking. (*Id.*).

Claimant eventually consulted with a nephrologist, Raheela Rehman, M.D., on July 10, 2013. (Tr. at 425-26). Claimant reported a ten to twelve year history of diagnosed high blood pressure. He advised that his blood pressure had measured 230/160s at the initial diagnosis, which prompted his admission to the hospital. Claimant was hospitalized a second time in 2009; however, this admission was for congestive heart failure. Claimant stated that he had been taking his current medications, including Exforge, Metoprolol, HCT, Clonidine, and Aspirin, for approximately one year, and his blood pressure was generally measuring 160-180/110. Claimant reported experiencing dizziness, blurry vision, and visual strokes when his blood pressure was high. He admitted to smoking half of a pack of cigarettes and drinking two cups of coffee per day. Claimant's review of systems was normal, with him denying current chest pain or palpitations,

---

[3] This test evaluates whether an individual suffers from Hyperaldosteronism, a disorder in which the adrenal gland releases too much of the hormone aldosterone into the blood, and often causes high blood pressure, headache, and other symptoms. *See* https://medlineplus.gov/ency/article/000330.htm

shortness of breath, dizziness, headache, and vision changes. On initial testing, Claimant's blood pressure was 187/112, but decreased to 180/102 on a subsequent manual recheck. His physical examination revealed no additional concerns. Dr. Rehman suggested that Claimant undergo a comprehensive workup to investigate the cause of his persistent hypertension. Noting that Claimant did not have any evidence of renal artery stenosis, Dr. Rehman decided to check renin and aldosterone levels. He switched Claimant's diuretic from hydrochlorothiazide to chlorthalidone and set a goal blood pressure of "150s/85s-95s to start with." Dr. Rehman counseled Claimant to follow a low salt diet and provided a list of foods to avoid.

On August 1, 2013, Claimant presented to a second nephrologist, Nasim Mastouri, M.D., who was also a hypertension expert. (Tr. at 479-81). Claimant brought a blood pressure log, which showed that his systolic blood pressure was measuring between 150 and 180 at home "despite being on 3 max anti hypertensive medications plus one diuretic." However, Claimant admitted that he was not following the recommended low salt diet and was smoking about a pack of cigarettes per day. Claimant denied having double vision or any other issues on the review of symptoms. His blood pressure at the time of examination was 148/98. No abnormalities were noted on his physical examination, except his weight, which was 242 pounds. Dr. Mastouri examined the results of Claimant's urinalysis and renal profile taken on July 22, 2013. After considering all of the findings, Dr. Mastouri diagnosed Claimant with congestive heart failure, benign essential hypertension, stage II chronic kidney disease, exogenous obesity, and nicotine dependence. Dr. Mastouri ordered additional laboratory studies and added the medication, Spironolactone, to Claimant's medication regimen.

Later that month, on August 27, 2013, Claimant saw Dr. Mastouri in follow-up.

(Tr. at 475-78). Claimant reported that he was following a low salt diet, and his systolic blood pressures, when taken at home, were measuring between 140 and 160. He reported some episodes of double vision and dizziness, but expressed no other complaints. Claimant's physical examination was unremarkable, except for his blood pressure, which was 150/102, and his weight. Dr. Mastouri renewed most of Claimant's medications, desisting Metoprolol, and adding Coreg to the regimen. He recommended that Claimant quit smoking, but Claimant stated that he was not interested in stopping at that time. Dr. Mastouri also discussed with the Claimant the potential consequences of not taking his medications as instructed.

Claimant saw Dr. Mastouri again on September 12, 2013. (Tr. at 471-74). Claimant brought his blood pressure log, which reflected improved blood pressure control, with systolic measurements "running ... between 130-160." Claimant reported one episode of a blood pressure measuring 200/119, but explained that it occurred when he was very upset about a situation at work. Claimant took Clonidine at that time, and his blood pressure dropped to 150/90. Claimant denied episodes of blurry vision, dizziness, vertigo, or shortness of breath, but admitted that he continued to smoke. A review of systems was normal. Claimant's blood pressure was 150/92, and his physical examination was normal, except for his weight, which was 247 pounds. An MRA of Claimant's renal arteries was also negative. Dr. Mastouri diagnosed Claimant with benign essential hypertension, spending nearly an hour counseling Claimant about the importance of taking his medications in the manner prescribed. Dr. Mastouri increased Claimant's dosage of carvedilol, instructed him to continue with a low salt diet, and advised him to quit smoking given the significant negative affect that smoking had on his kidney function and blood pressure.

On November 4, 2013, Claimant saw Dr. Mastouri for a six-week blood pressure recheck. (Tr. at 468-70). Claimant brought his blood pressure log, which documented systolic blood pressures "running between 130-160s at home." Claimant reported that he had not filled the spironolactone prescription and continued to smoke; however, he had no particular complaints on a review of systems, specifically denying episodes of double vision, visual changes, chest pain or palpitations, labored breathing, and psychological issues. Claimant's blood pressure was 140/80, and his physical examination was normal, except for his weight, which had increased to 258 pounds. Dr. Mastouri diagnosed Claimant with congestive heart failure, benign essential hypertension, chronic stage II kidney disease, and nicotine dependence. Dr. Mastouri increased Claimant's dosage of Coreg and instructed him to continue taking his other medications as prescribed, with the exception of Aldactone.

On December 30, 2013, Claimant returned to Dr. Mastouri for follow-up. (Tr. at 465-67). Claimant admitted that had not been taking all of his blood pressure medications as prescribed, and his blood pressure was averaging "between 140s-160s at home." He also admitted to continued tobacco use. Nevertheless, Claimant denied symptoms, including headache, blurry vision, and chest pain. His blood pressure was 170/124, and his heart rate was 76 beats per minute. Despite the blood pressure reading, Claimant appeared alert, oriented, and in no acute distress. His physical examination was normal, except for his weight, which was now 264 pounds. Dr. Mastouri diagnosed Claimant with congestive heart failure, benign essential hypertension, stage II chronic kidney disease, and exogenous obesity. Noting that Claimant was unable to afford some of his blood pressure medications, Dr. Mastouri exchanged the more expensive prescriptions with less expensive alternatives. Claimant advised that he was losing his Medicaid coverage and

could not return until his insurance was "fixed."

Nearly a year later, on November 12, 2014, Claimant presented to an internist, Rodica Chele, M.D., for an evaluation. (Tr. at 460-63). Dr. Chele documented that Claimant was obese with untreated Hepatitis C due to alcohol consumption. Claimant indicated that he continued to drink three to four beers per night and for that reason could not receive Hepatitis C treatment. Claimant also reported uncontrolled hypertension, but admitted that he was noncompliant with his medication regimen and recommended diet. He continued to smoke a pack of cigarettes per day and complained that he had gained 20 pounds in the past eight months. Claimant reported episodes of blurry vision and dizziness when his blood pressure was elevated, advising that his blood pressure measured in the 190/110 range when he took it at home. Claimant admitted that he was not taking the prescribed dosage of Clonidine and did not exercise regularly. On a review of systems, Claimant denied having double vision, changes in vision, chest pain or palpitations, labored breathing, muscle pain, altered mental status, or emotional lability. His blood pressure was 170/110. Claimant had a steady gait, clear lungs, and his cardiovascular, abdominal, and neurological examinations were all normal. Dr. Chele diagnosed Claimant with mild stage II chronic kidney disease, benign essential hypertension, anxiety, exogenous obesity, nicotine dependence, congestive heart failure with no overt signs of decompensation, and chronic Hepatitis C for which he must cease drinking to pursue treatment. She instructed him to obtain laboratory work before his next appointment, take his medications as prescribed, log his blood pressure and bring the log to his next visit, follow the recommended diet, lose weight, exercise, and cease using tobacco and alcohol.

### B. Evaluations

On November 12, 2012, Claimant's treating nurse practitioner, Nurse Vannoy, examined Claimant for the West Virginia Department of Health and Human Resources. (Tr. at 347-49). Claimant advised Nurse Vannoy that he was disabled due to an inability to see, double vision, elevated blood pressure, eye strokes, and Hepatitis C. His blood pressure was 190/129; he was 5'10" tall; and he weighed 257 pounds. Claimant's speech, posture, and gait were observed to be normal. His vision without glasses was 20/50 in the right eye and 20/30 in the left eye. Claimant denied having any pain symptoms. His physical examination was entirely normal, except for weight and blood pressure. Nurse Vannoy diagnosed Claimant with high blood pressure and blurred vision. She opined that Claimant could not work full time due to double vision. However, Nurse Vannoy could not estimate the length of time Claimant would be unable to work, indicating that he needed to see an eye doctor. She also felt he needed to have testing to rule out an unknown cause of his hypertension, and he needed to see a specialist in Hepatitis C.

On March 13, 2013, Dr. Hansen completed a disability pension examination report form directed to the Iron Workers' Pension Trust. (Tr. at 456). Dr. Hansen opined that Claimant was totally and permanently disabled from engaging in further work as an Ironworker or as any other type of Building Trades Craftsman. Dr. Hansen's opinion was based upon Claimant's diagnoses of hypertension, congestive heart failure, prediabetes, eye strokes, pre-glaucoma, anxiety and depression. Dr. Hansen explained that due to Claimant's hypertension, he had suffered damage to his vision that prevented him from driving, reading, and balancing. Although conceding that his first and only visit with Claimant was on the same date as the report form, Dr. Hansen opined that Claimant's disability began on October 27, 2011. Dr. Hansen recommended re-examination in three

months.

On May 13, 2013, consulting agency physician, Dominic Gaziano, M.D., completed a physical RFC assessment of Claimant based on a review of his records. (Tr. at 57-60). Dr. Gaziano concluded that Claimant had severe impairments of visual disturbance and essential hypertension. Dr. Gaziano found Claimant's allegations regarding the intensity, persistence, and severity of his symptoms to be only partially credible, noting that while Claimant's vision was somewhat limited, his activities of daily living undermined his claims of disability. Dr. Gaziano opined that Claimant had no exertional, postural, manipulative, or communicative limitations; however, his vision was reduced in both eyes and he required environmental restrictions. Dr. Gaziano acknowledged that Claimant was both nearsighted and farsighted, but felt he had no major deficiencies in terms of depth perception, accommodation, color vision, and field of vision. Dr. Gaziano added that Claimant continued to have a mild unilateral loss of field of vision, but his visual acuity was correctable and his double vision had resolved according to his eye examination. In view of Claimant's impairments, Dr. Gaziano opined that Claimant should avoid concentrated exposure to vibrations and all exposure to hazards.

On June 4, 2013, Eugene Lin, M.D. performed an Independent Medical Examination of Claimant at the request of the Iron Workers' Benefit Trust. (Tr. at 441-43). Dr. Lin documented that Claimant was 53 years old, weighed 249 pounds, and was 5 feet 10.5 inches tall. He had previously worked as an Ironworker until a scheduled layoff in November 2010. Claimant was not under any work restrictions at the time of the layoff. Claimant reported that he had stopped driving in 2008 due to episodic dizziness and high blood pressure. He admitted to occasionally doing yard work with a riding mower, but stated that his blood pressure and dizziness increased with the exertion and heat.

Claimant described his current symptoms as headache and occasional blurred vision, as well as dizziness, and a history of Hepatitis C. He admitted to drinking three to four beers nightly, occasionally smoking marijuana, and smoking half of a pack of cigarettes daily for thirty years. On examination, Claimant's blood pressure measured 178/100 in the left arm and 170/100 in his right arm. His heart rate was 75, and he had 2+ pitting edema in his legs. Claimant's lungs were clear to auscultation; his extraocular motions were intact; he had good transfers from sitting to standing; and he walked with a normal gait.

In the discussion section of the examination report, Dr. Lin described Claimant as having a longstanding history of hypertension that had been difficult to control despite medical management. Claimant's symptoms of headache and dizziness were associated with spikes in his blood pressure. Pointing out that the job description for an Ironworker required standing six to seven and a half hours per shift while wearing a 50-pound tool belt and performing very strenuous activities like climbing, lifting, and bending and pulling of steel, Dr. Lin opined that Claimant was totally disabled from his prior occupation as an Ironworker. Dr. Lin added that Claimant should be reevaluated in approximately one year after the outcome of his pending renal evaluation and after sufficient time had passed for optimizing his blood pressure medications.

On August 21, 2013, agency consultant, Pedro F. Lo, M.D., reviewed Claimant's records and Social Security file, including Dr. Gaziano's evaluation. (Tr. at 77-80). Dr. Lo considered additional information not available at the time of Dr. Gaziano's review; such as the examination and RFC assessment prepared by Dr. Hansen. Dr. Lo stated that the new evidence confirmed that Claimant had poorly controlled hypertension, but also showed an absence of renal stenosis and a normal aldosterone level. Dr. Lo noted that Claimant was currently being referred to a nephrologist, but concluded that the new

records did not demonstrate a significant change in Claimant's clinical status. After considering all of the evidence, Dr. Lo agreed with Dr. Gaziano's opinions and affirmed his RFC assessment.

On November 26, 2014, medical consultant, Paul W. Craig II, M.D., examined Claimant at the request of his attorney. (Tr. at 516-20). After reviewing documents, interviewing and examining Claimant, Dr. Craig diagnosed Claimant with uncontrolled malignant hypertension with end organ damage (hypertensive retinopathy); history of Hepatitis C, which may or may not be active; fatigue, malaise, dizziness, headache, and vision difficulties. Dr. Craig opined that Claimant could not work an eight-hour, five-day per week job, in any capacity. He felt Claimant was limited to sedentary or very light activities due to his blood pressure and associated symptoms. Dr. Craig suggested that Claimant be re-evaluated in one year to see if he improved with aggressive intervention or treatment, which would also require Claimant's compliance. However, Dr. Craig believed that "[a]t present it is simply not safe for him to work." (*Id.*).

As to Claimant's function-by-function assessment, Dr. Craig opined that Claimant could lift or carry a maximum of 25 pounds, with a maximum of 10 pounds occasionally (defined as up to 1/3 of an 8-hour work day), and could not frequently (defined as 1/3 to 2/3 of an 8-hour work day) lift or carry any amount of weight. He felt that Claimant could stand and/or walk for 4 to 6 hours in an 8-hour workday, but could only do so for 1 to 2 hours without interruption. Claimant could sit for 6 to 8 hours in a workday, but only 2 to 4 hours without interruption. In addition, Claimant could only occasionally stoop, crouch, kneel, and crawl, and could never climb or balance. In support of these limitations, Dr. Craig relied on "examination, history and record review." Dr. Craig additionally opined that Claimant had no limitation in reaching, handling, feeling,

hearing, and speaking, but was limited in pushing/pulling and seeing. He felt Claimant was restricted in every environmental aspect. Dr. Craig explained these restrictions by referring to Claimant's symptoms of blurred vision and history of hypertensive retinopathy. (*Id.*).

### C. Claimant's Statements

In an Adult Disability Form filed by Claimant shortly after applying for SSI and DIB, he stated that he stopped working in November 2010, because he was "laid off from work." (Tr. at 259). Claimant indicated that prior to the lay-off, he had worked as an Ironworker, which was a position he held for more than fifteen years. (Tr. at 260). His job duties as an Ironworker included lifting items that weighed as much as 100 pounds and frequently lifting 50 pounds or more. (Tr. at 261). In that positon, Claimant spent eight hours each work day walking; four hours climbing, stooping, kneeling, crouching, and crawling; eight hours handling large objects; and eight hours reaching. (*Id.*).

In an Adult Function Report completed by Claimant on January 29, 2013, he stated that his impairments interfered with his ability to work as an Ironworker, because he had to be able to balance, lift heavy equipment, and have excellent vision. (Tr. at 273). According to Claimant, he spent his days trying to keep busy, helping around the house and visiting with elderly neighbors. (Tr. at 274). He experienced dizziness upon waking and sometimes throughout the day; however, he could attend to his own personal needs, do laundry, take out the trash, make sandwiches and occasionally cook, and do yard work using a riding mower. (Tr. at 275). He spent 2 hours per week shopping at stores, spent a lot of time outdoors pacing, and watched television. Claimant stated that he "should no longer lift anything over 50 pounds." (Tr. at 278).

Claimant filed a supplemental Adult Function Report on July 30, 2013, in which

he described his limitations as being more severe. (Tr. at 298-304). For example, Claimant indicated that he "shouldn't lift 25-50 [pounds]." (Tr. at 302). However, he still stated that he tried to start and take on projects around the house, paced a great deal, completed personal care without assistance, prepared light meals, did laundry, rode the riding mower, shopped once per month, and went to doctors' visits. (Tr. at 298-301).

At the administrative hearing on December 3, 2014, Claimant confirmed that he quit working due to being laid off. (Tr. at 32). Claimant indicated that after his lay-off, he received unemployment benefits and continued to be available for work until he received disability benefits from the Ironworkers' union. (Tr. at 32, 35). Claimant testified that hypertension and its related symptoms of dizziness and fatigue were the only current obstacles to him working. (Tr. at 32-33). Claimant admitted that he had suffered from hypertension for twelve years and had similar symptoms when he worked as an Ironworker. When asked about daily activities, Claimant said he did not do much, but he still mowed the yard, gardened, cooked, did laundry, and cared for his dog. (Tr. at 37-39). However, Claimant did not feel that he could sit an entire eight-hour work day, because he had trouble focusing. (Tr. at 43).

## VI.   **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.　Analysis

Claimant contends that he should have been limited to sedentary or, alternatively, light level exertional work, which would have directed a finding that he was disabled at the age of 50 under Grid Rule 201.10 or at the age of 55 under Grid Rule 202.02, respectively. Claimant argues that, *inter alia*, his testimony and the medical evidence, particularly the findings and opinions of Drs. Lin, Hansen, and Craig, overwhelmingly support his position.

The Grids are used at the fifth step of the sequential disability process, setting out "numbered table rules which direct conclusions of 'disabled' or 'not disabled'" when a claimant's characteristics coincide with those of a numbered rule. SSR 83-12, 1983 WL 31253, at *1 (S.S.A. 1983); *see* 20 C.F.R. Pt. 404, Subpart P, Appendix 2. In evaluating whether there are jobs that exist in significant numbers in the national economy, the ALJ

may rely upon the Grids, as they "take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); s*ee also* 20 C.F.R. §§ 404.1569, 416.969. When a claimant has only exertional impairments and his strength capacity falls neatly within a specific exertional level, the Grids control the disability determination. However, when a claimant has significant nonexertional impairments, or has a combination of exertional and nonexertional impairments, the Grids often do not provide adequate information for the ALJ to complete the disability analysis. 20 C.F.R. §§ 404.1569, 416.969. In these situations, the Grids provide only a framework for the ALJ, who must then give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* Even in these cases, however, the ALJ must first consult the Grids to determine whether a numbered rule directs a finding of disability based on the exertional (or strength) requirement alone. If so, there is no need to assess the effects of nonexertional limitations. However, if the Grids direct a finding of "not disabled," the ALJ cannot rely on the finding and, instead, must establish the availability of jobs through the testimony of a vocational expert. *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989).

In the instant action, the ALJ examined the Grids and concluded that the applicable numbered rules directed a finding of "not disabled" in Claimant's case. Accordingly, the ALJ proceeded to give full consideration to the relevant factors and employed the assistance of a vocational expert to determine the availability of jobs in the national economy that Claimant was capable of performing. Claimant objects to the ALJ's finding under the Grids, arguing that if the ALJ had found him capable of performing only

light or sedentary level exertional work, the Grids would have directed a finding of disability. Thus, this court must direct its attention to whether the ALJ properly analyzed the *exertional* component of Claimant's RFC.

"Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling." *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996). "To determine the physical exertion requirements of work in the national economy," the SSA classifies jobs as "sedentary, light, medium, heavy, and very heavy." 20 C.F.R. §§ 404.1567, 416.967. Sedentary work involves lifting no more than 10 pounds at a time, sitting a majority of the day, and occasionally walking or standing. *Id.* at 404.1567(a), 416.967(a). Light work requires lifting no more than 20 pounds with frequent lifting of objects weighing up to 10 pounds, a good deal of walking or standing, and some sitting with pushing or pulling of arm or leg controls. *Id.* at 404.1567(b), 416.967(b). Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id.* at 404.1567(c), 416.967(c). According to SSR 83-10:

> A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of

weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983); *see* 20 C.F.R. §§ 404.1567(c), 416.967(c). As stated, the ALJ found that Claimant had the RFC to perform less than a full range of medium work. (Tr. at 14). Nonetheless, the ALJ determined that Claimant had the RFC to fulfill all seven of the strength demands of medium work.

SSR 96-8p provides guidance on how an ALJ should properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's seven strength abilities, as well as "other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental and psychological capacity; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR 404.1545(b-d) and 416.945(b-d). Only by examining specific functional abilities can the ALJ determine (1)

whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ conducted the RFC assessment, including the strength analysis, in compliance with Social Security regulations and rulings and reached an RFC finding that was supported by substantial evidence. The ALJ analyzed the objective and opinion evidence, assessed Claimant's functional abilities, and articulated her reasoning for the RFC finding. The ALJ cited Claimant's allegations that he was unable to work due to symptoms of hypertension, deficits in visual acuity, and loss of field of vision. (Tr. at

15). She also noted Claimant's reports that his high blood pressure caused dizziness and fatigue and, at its worst, it caused eye strokes and/or blurred vision. (*Id.*). However, the ALJ found that Claimant had worked for nearly a decade despite symptoms of hypertension that were present at approximately the same level of severity. (Tr. at 15-16). Indeed, Claimant testified that he quit working, not because of his hypertension and related symptoms, but because of a scheduled lay-off, and he subsequently sought work from 2010 to 2012. (Tr. at 15).

Further, the ALJ found that Claimant's treatment records did not show a pattern of deterioration in his condition since his initial diagnosis; rather, his records showed periodic flare-ups generally following periods of noncompliance with treatment. (Tr. at 16). The ALJ determined that when Claimant followed prescribed treatment, his hypertension was well controlled. (*Id.*). Unfortunately, as noted by the ALJ, Claimant's noncompliance with treatment stretched far into the past, well before the alleged onset of disability, and throughout much of his employment as an Ironworker. (*Id.*). Nonetheless, Claimant was fully able to meet the seven strength demands of heavy physical labor.

As to his alleged visual symptoms, the ALJ stated that Claimant did not take any medications for an eye impairment and the record indicated that his visual symptoms were attributed to his hypertension and were present primarily during episodes of high blood pressure. (*Id.*). The ALJ concluded, based on the evidence, that Claimant could control these symptoms by strictly adhering to his medication regimen. The above factors strongly suggested to the ALJ that Claimant's impairments did not prevent him from continuing to work. (*Id.*). However, the ALJ accepted that, to a degree, Claimant's intermittent dizziness, occasional blurred vision, and fatigue, combined with his obesity, would reduce the exertional capacity that Claimant could achieve and sustain and would

prohibit him from climbing ladders, ropes, or scaffolds or working at unprotected heights, around dangerous machinery, or vibrating equipment. (*Id.*).

In weighing the opinion evidence and explaining her RFC finding, the ALJ gave partial weight to Dr. Lin's opinion that Claimant could not perform the full requirements of his past work as an Ironworker. (Tr. at 17). She also gave partial weight to Dr. Craig's opinion, agreeing that Claimant should not climb ladders, ropes, or scaffolds, or work at unprotected heights. (*Id.*). However, she did not find Dr. Craig's opinion that Claimant could not work in any capacity on a full time basis to be consistent with the record, as Claimant worked for years at a heavy exertional level with his present symptoms. (*Id.*). Also, the ALJ rejected Dr. Craig's opinion that Claimant could not lift more than 10 pounds occasionally, as Claimant acknowledged in his Function Report that he could lift up to 50 pounds. (*Id.*). As to Dr. Hansen's opinions, the ALJ gave weight to the opinion that Claimant could not work at heights due to dizziness and poor balance. (*Id.*). However, she rejected Dr. Hansen's opinion that Claimant was unable to work at present, because the opinion was conclusory, was on an issue reserved to the Commissioner, and was inconsistent with the evidence of record, including Claimant's activities of daily living and work history. (*Id.*). Finally, the ALJ gave little weight to the opinion of Nurse Vannoy that Claimant could not work because he had double vision. (*Id.*). As explained, the ALJ found that Claimant's eye impairments were related to his hypertension and tended to become debilitating only when Claimant did not follow prescribed treatment. (Tr. at 18). Further, the ALJ felt Claimant's visual limitations were largely outside the scope of Nurse Vannoy's expertise as a family nurse practitioner, indicating that Nurse Vannoy undermined her own opinion by conceding that Claimant should be referred to an eye doctor. (*Id.*).

The ALJ clearly assessed the relevant functions of medium work, resolved

inconsistent evidence, and articulated her rationale for concluding that Claimant could perform the strength demands of medium work. Regarding the lifting requirements, the ALJ emphasized Claimant's acknowledgement that he could lift 50 pounds, (Tr. at 17, 278), noting that he regularly lifted much more than that amount as an Ironworker. Furthermore, none of the medical source opinions ruled out Claimant's ability to stand, sit, and walk to the extent required by medium work. Even Dr. Craig, who provided the most limited RFC assessment, opined that Claimant could stand or walk for up to 6 hours in an 8-hour workday. (Tr. at 519). While Dr. Craig found more severe limitations on lifting, stooping, and crouching than allowed by medium work, the ALJ provided her rationale for not affording his opinion full weight. (Tr. at 17).

Overall, the record substantially supports the ALJ's assessment that Claimant is capable of the strength demands of medium level exertional work. The evidence demonstrates that Claimant performed heavy to very heavy labor for nearly a decade while he suffered from the same impairments and symptoms now alleged to be the source of his disability. Moreover, the ALJ correctly concluded that Claimant's symptoms were controlled when Claimant was compliant with his medication regimen and low salt diet. (Tr. at 468, 471, 475). Presumably, Claimant could function even better if he would simply follow all of the directives given to him by his physicians; such as, to stop drinking and smoking, to lose weight, to exercise, and to take his medications in the proper order and at the recommended times. Notwithstanding the significant improvement realized by Claimant during his brief periods of compliance, he repeatedly failed to take his blood pressure medication as prescribed, continued to smoke up to a pack of cigarettes per day, failed to lose weight and instead gained weight, ate foods high in sodium, and continued to drink alcohol despite contrary instructions by his medical providers. (Tr. at 343, 345,

376, 377, 378, 379, 412, 425, 452, 460, 465, 468, 471, 474, 478, 479). The ALJ reasonably considered this evidence in assessing Claimant's credibility and determining his RFC. *See Dunn v. Colvin*, 607 F. App'x 264, 275–76 (4th Cir. 2015).

Moreover, for the most part, the medical records and source statements do not preclude medium level work. The state agency consultants found that Claimant had no exertional, postural, or manipulative limitations, despite his impairments. (Tr. at 58, 78). These opinions were supported by the treatment records, which generally reflected normal physical examinations, without musculoskeletal and neurological signs and symptoms. Other than complaints directly associated with hypertension, Claimant rarely reported abnormalities on the review of symptoms and uniformly denied having any pain. In the RFC assessments of record, Nurse Vannoy did not document any physical limitations that would prevent Claimant from lifting and carrying up to fifty pounds and standing, walking, or sitting up to six hours, each, in an eight-hour work day. Likewise, Dr. Lin pointed out that Claimant had no work restrictions at the time he was laid off as an Ironworker. While Dr. Lin did not believe Claimant was physically able to continue as an Ironworker, he framed that opinion in the context of the job description provided to him, which required Claimant to stand six to seven and half hours each day wearing a 50-pound tool belt while performing strenuous climbing, lifting, and bending and pulling of steel. Thus, the ALJ's conclusion that Claimant was capable of performing the strength demands of medium level work was not inconsistent with the opinion of Nurse Vannoy or Dr. Lin. Similarly, Dr. Hansen did not find Claimant disabled from all work; to the contrary, he merely opined that Claimant could not work as an Ironworker or in a similar occupation.

Importantly, an RFC assessment is "an adjudicator's finding about the ability of an

individual to perform work-related activities." SSR 96-5P, 1996 WL 374183, at *5 (S.S.A. 1996). Thus, while the ALJ must consider, discuss, and reconcile the evidence, including the medical source statements, the RFC is ultimately an administrative finding. *Id.* ("A medical source's statement about what an individual can still do is medical opinion evidence that an adjudicator must consider together with all of the other relevant evidence (including other medical source statements that may be in the case record) when assessing an individual's RFC. Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment."). As previously noted, the ALJ is charged with weighing the evidence, resolving conflicts, and making credibility determinations. *Hays,* 907 F.2d at 1456. The court's duty is to scrutinize the record to determine whether the ALJ's conclusions were reached in compliance with applicable law and were supported by substantial evidence. *Id.* For the reasons stated above, the ALJ's determination that Claimant was capable of performing the seven strength demands of medium level work was properly reached and was supported by substantial evidence. Consequently, the ALJ correctly applied the numbered rules pertaining to medium exertional level work, which directed a finding of "not disabled" under the Grids, and proceeded to properly resolve step five of the disability process with the assistance of a vocational expert.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, the Court will **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 11); **GRANT**

Defendant's motion for judgment on the pleadings, (ECF No. 12); and **DISMISS** this action from the docket of the Court. A Judgment Order will be entered accordingly.

The Clerk of this Court is directed to transmit copies of this Memorandum Opinion to counsel of record.

**ENTERED**:  June 27, 2017

Cheryl A. Eifert
United States Magistrate Judge